Good morning. Was there going to be splitting up the argument? Yes, Your Honor. Good morning, Your Honors. May it please the Court. My name is Todd Thibodeau. I'm here with co-counsel Robert Sheehan. We represent Lois Goodman. I'm going to reserve, I'm trying to reserve about five minutes for Mr. Sheehan to make some points and rebuttal. Your Honors, when Dr. Wang changed the manner of death determination in his autopsy report and wrote homicide, that word homicide had the exact same meaning as Lois killed Alan. It was not homicide by some unknown person. Lois was the only suspect ever. Her name doesn't appear in that autopsy report, though, does it? Her name doesn't appear in the autopsy report, Your Honor. However, it appears all over the coroner case notes. Lois is the person who Detective Pateek contacted Dr. Wang about more than two dozen times over the course of the summer to give him derogatory information about her. Lois is the person that Detective Pateek prompted Dr. Wang to change the manner of death because she was going on vacation. And the coroner case notes are at 7 ER 1883. Dr. Lakshmanan, who was at that time the coroner, testified that he understood that Lois was the suspect. And in fact, as I was asking Dr. Lakshmanan about that, the district court said, that's been established. Let's move on. And that's at 5 ER 1238. And so in this case, in order to if it wasn't homicide, if if Lois didn't kill Alan, then it was an accident by definition, because the manners of death, the potential manners of death were accident, homicide, natural suicide. And we knew it wasn't natural and we knew it wasn't suicide. So if Lois didn't kill Alan, then by definition it was an accident. And in fact, Dr. Wang, he argued throughout trial two things. He argued that, number one, whether Lois killed Alan wasn't relevant, even though homicide in this case meant exactly the same thing. And then number two, he spent a lot of time in trial actually trying to prove that Lois did, in fact, kill Alan. He refused to stipulate before trial that Lois didn't kill Alan. They asked questions of Lois on cross-examination to insinuate that she killed Alan. Doctors Fierro, the expert, Dr. Lakshmanan, Dr. Wang and Detective Pateek all testified that as of today or the date of the trial, it was still their opinion that this was a homicide. In other words, it was still their opinion that Lois killed Alan. And so despite all this, the district court excluded evidence that went to the heart of the case. The heart of our case was Lois did not kill Alan, and therefore the statement in the autopsy report. Were those questions asked by the plaintiff or by the defense? By the plaintiff. The plaintiff repeatedly attempted to introduce the DNA evidence. Of the detectives, for example. Was the plaintiff's inquiry of the detective at the trial whether or not he believed that the death was caused by homicide? No. That question asked by the plaintiff? That was the defendant, Your Honor. The defendant asked Detective Pateek, what about today? Do you still think this was murder? And the detective said he was 100% certain that it was murder as of today. And so if it was, if they were still thinking as of today, their position as of today, as of the date of trial, was that Lois killed Alan. Then the DNA went to the crux of the matter because the DNA ruled out Lois's having killed Alan. They collected the mug and Lois's clothes at the site where Mr. Goodman died. And the mug only had Mr. Goodman's DNA on it. Mrs. Goodman, who was supposedly swinging these jagged pieces of mug with her bare hand, had no DNA on the mug. The clothes that Mrs. Goodman was wearing, none of Mr. Goodman's DNA was on any of this clothing, which was collected and tested. But the jury was aware that the charges against Mrs. Goodman had been dismissed at that point? That's correct. And as a matter of fact, Your Honor, they made a point of bringing out from the detective, and I believe the district attorney, that they were dismissed without prejudice, meaning that they were still free to refile the charges against Mrs. Goodman. And the jury was also aware that there was DNA evidence, a DNA report that became available after Dr. Wong's change of the cause of death to homicide? None of that was allowed, Your Honor. In fact, when Dr. Wong testified in response to my questioning, whether he still believed it was homicide at that point, I attempted to ask him about whether he was aware that there was DNA testing, and that was excluded as not relevant. When Drs. Fierro and Drs. Lakshmanan testified that it was their opinion, arrived after, well after the DNA results were available, that it was still homicide, the DNA results were still excluded. Well, let's distinguish between the results and the contents of the results. In other words, the jury was advised that a DNA report had been prepared. I don't think that's correct, Your Honor. I don't think they were. I think all of that was excluded. And certainly the results were excluded, which is the most important thing in proving that Lois did not kill Alan. So the DNA results were excluded. And by excluding the DNA results, Lois was prevented from proving, number one, that the autopsy report was false. I mean, that's the first thing you have to prove. If you're going to prove a false statement or a falsification by material omissions, the first thing you have to prove is that it's false, that homicide is not true. By excluding the DNA evidence alone prevented us from proving that the conclusion of homicide was false. And then in addition to that, there was a whole lot of evidence of material omissions that were excluded, such as the omission of the fingerprint evidence. Mrs. Goodman's fingerprints were not on the mug. The judge excluded that. The district court excluded that. There was testimony by the district attorney's crime scene expert, Tom Bevel, who they brought in from Oklahoma to look at the crime scene. He opined in his deposition that there was no evidence that Mrs. Goodman was even home at the time Alan Goodman died. And that was excluded. The district court refused to allow us to examine Dr. Wong on issues that this court had previously said were relevant. This court previously said that the fact that Dr. Wong changed the manner of death to homicide without explaining why, a reasonable jury could rely on the name standards, the H-31 standards that say you've got to explain why. A reasonable jury could rely on that in finding that he falsified the report. And the district court precluded us from asking Dr. Wong about the name standards. The district court precluded us from asking Dr. Wong about the many issues that he left out of the autopsy report, saying that the report spoke for itself and that the jury would get the report and they could look at it and make their own determination. The court prevented us from cross-examining Dr. Wong's primary expert, Dr. Fierro, who came in from Virginia, who was a very well-known medical examiner. She came in from Virginia. She said it's still her opinion, and it was her opinion in 2014, two years after the events, that this was a homicide. And she went forward with, you know, she gave her opinion why, and she did an accident reconstruction, and we were prevented from asking her what her qualifications were to testify as an accident reconstruction specialist. She testified that she relied on two other medical examiner reports in coming up with her opinions. One of those reports was the report, again, that this court referred to specifically in its memorandum opinion the last time we were on summary judgment, the report that said that Dr. Wong's report was, and I want to quote it accurately, it was defective and far outside national guidelines. We weren't allowed to ask Dr. Fierro about that, even though she said that she relied on that report informing her opinions. And finally, the court imposed what appeared to be a very arbitrary and turned out to be a very inflexible 12-hour time limit, which was then leveraged into, once the court sort of realized that, excuse me, DNA evidence probably was highly relevant, that time limit, the fact that we were running up against it, kind of leveraged into the court's decision not to allow us to pursue the DNA issue. And so, Your Honors, in conclusion, the errors that the district court made in excluding all this evidence, this evidence that was critical to Mrs. Goodman's case, went to the heart of her case. It was a manifest abuse of discretion, and it clearly impacted the jury's decision. And for those reasons, this court should reverse the judgment and remand this case for a new trial. Thank you, Your Honors. Good morning, Your Honors. We set out in our brief our arguments in very specific detail why these challenged, numerous challenged rulings on the part of the district court, none of them lay beyond the pale of reasonable justification. Which is the standard for abuse of discretion articulated by this court. Taking the DNA evidence first, the test results, that was, the decision to exclude was in the context of a Rule 403 hearing. So probative value of the evidence does not mean that it's not relevant, it assumes it has some relevance. But the question is how much value it has in relation to other considerations. The trial court, the district court thought Mrs. Goodman's guilt or innocence was not the central issue, but whether the autopsy report was defensible, which is what the Ninth Circuit said in the first appeal, whether it met standards or was so deficient that it should be deemed falsification. Probative value depends on other evidence. For example, is there other evidence that would take less time to put on? There was other evidence that was exculpatory. There was the evidence of the officer on the scene who saw no evidence of foul play, hence it was first deemed an accident. There was the evidence that the district attorney dismissed the charges because she had two experts, one of whom was Mr. Goodman. One of the experts who said this fellow fell and that was the reason he died. The jury heard that. They also heard that manner of death conclusions are judgment calls. They heard that from plaintiff's expert, that pathologists can disagree on the manner of death on the very same facts. So the jury had that in mind and when the judge decided the probative value was not enough to outweigh the time that it would take to put on this DNA evidence, he was correct. And it is interesting to me that plaintiff admits in the reply brief that putting on this DNA evidence would have been very time consuming. There were collection issues. It was collected five days after the event. It was found in the trash. Who knows how it had been handled and so forth. Plaintiff in his reply brief admits you would need expert testimony on this and it would, quote, add time and complexity to the trial. So the trial court decided that was time that didn't need to be spent on that. And in fact, if you read the record through, the tug in the whole trial is to keep focused on the autopsy report and not stray off into asking the jury to determine the guilt or innocence of Mrs. Goodman. In addition, plaintiff made no showing of prejudice here. If the jury had known about the DNA results, the question would be, would it probably have found the report falsified? The DNA, the fact that it had to be disclosed, did it have to be disclosed to prevent homicide from being misleading? I would like to say that homicide doesn't necessarily equate to, as plaintiff said, Lois killed Alan. Homicide means not accident. Homicide means not suicide. Homicide means not natural causes. Those are the choices. It means not undetermined. The change was from we don't know what caused this death to homicide. Wasn't the chief medical examiner asked during the trial whether or not, again, not with respect to what the results were, that whether or not DNA testing was done in connection with the investigation? I don't know if he was asked if it was done regarding this investigation. I think there was a general question as to whether DNA can sometimes turn up in an autopsy report, but I don't recall the specific question. The question is, if the jury had known that the DNA tests and what they said, I think it is just as likely that they would have found no falsification to admit results to the autopsy report. The DNA results didn't exist until a month after the report issued. The report issued in August. I think plaintiff's brief, I was looking at the sites, plaintiff's brief at 17 said the DNA results became available two weeks after plaintiff was arrested, and so after the autopsy report issued. Isn't one of the arguments that the finding by Dr. Wong of death caused by homicide was reckless because he did not wait for the DNA results to be completed? But the jury never even reached that question. They never reached his kind of state of mind or reckless or intentional or whatever. They just said there was nothing omitted. There was nothing omitted here that needed to be in there to make the conclusion misleading. And they had, they could have believed Mrs. Goodman did not kill her husband on the basis of the other evidence they had, that the officer saw no signs of foul play, that the charges were dismissed, that other people thought it was an accident. They could have believed that and still found no falsification, and particularly when, how do you falsify a result when the results, the DNA results come out a month later? How is omitting them a falsification when they hadn't even, they weren't even in existence at that point? So we think there was no abuse of discretion on that point. And I was interested on the other things that were sort of touched on here. Dr. Wong wasn't allowed to talk about the contents of the autopsy report. Yes, he was. If the questions were framed correctly, he answered. He testified, for example, certain injuries described were consistent with a fall, but he didn't say so explicitly. He said that the DME required documentation about the absence of defensive wounds. He thought he had documented it by drawing it, by leaving blanks on the back of hands, for example. The diagram was documentation for that. Plaintiff argues in the reply that it's not about standards. This was about the Fourth Amendment. Well, it is about standards. In the opening brief, plaintiff quoted the Ninth Circuit after the first appeal, holding that evidence Dr. Wong failed to adhere to minimum standards would support a finding of falsification. And he said again he needed those standards because they were crucial. So this was about standards. But there was nothing in his arguments about Dr. Wong's testimony about the named standards, about time and so forth, showing that the jury would probably have ruled differently on the basic fact of falsification had things gone differently for him. And on the time factor, I would like to say I don't really understand their argument, because in the reply he said he only gave me 30 minutes to finish my case. Well, the judge asked him, how much time do you need to finish with your witnesses? He said 30 minutes, and then he got an hour for argument that wasn't included in the original 12-hour allotment. So I don't understand the complaint there. Basically, I think this is a case where a judge was working extremely hard to keep it on track, that there was nothing in his decisions that warranted being called beyond the pale of reasonable justification. His decisions were reasonable. And if there are no questions, I'll submit. Thank you. May it please the Court, I'm Robert Sheehan, co-counsel for Mrs. Goodman, along with Mr. Thibodeau. We've been here before on this case, Your Honors. We had the pleasure, the honor of being here for one of Judge Pragerson's last arguments and one of his last opinions. And I think it is important when we consider this case to consider what this Court has already ruled on this case. First of all, as Judge Pragerson pointed out, this isn't a run-of-the-mill case. In his opinion, he pointed out that this is the case of the lady from Woodland Hills who was arrested in New York City at the U.S. Tennis Open. She was put on national TV, she was paraded around, they put her in Rikers Island, and they took her to L.A. County Jail. And it was just a horrific experience. What has been pointed out is that although Dr. Wong may not have caused all of that directly, Dr. Wong knew that when he changed the cause of death to homicide, he knew that Lois Goodman was going to be arrested. And that is clear from the record. The majority opinion stated that Dr. Wong failed to follow standards H31.7 and H31.9 created by the National Association of Medical Examiners requiring a coroner to provide a reason for the change in the cause of death. It would seem to me that when this Court tells the District Court that the National Association of Medical Examiners' standards are relevant to the cause of death, it would seem to me that Dr. Wong failed to follow those standards. And it would seem to me that Dr. Wong failed to explain to this case that the District Court should follow what this Court has already ruled. Instead, the District Court went out and created a ruling of its own and excluded the name standards after this Court had said the name standards are important. This Court said that Dr. Wong's report omitted evidence that Alan's injury was consistent with an accidental fall. This Court said that Dr. Wong's report omitted evidence that Alan's injury was consistent with an accidental fall. This Court said that Dr. Wong's report omitted evidence that Alan's injury was consistent with an accidental fall. Over and over again, we asked to be allowed to bring in evidence that Alan's injury was consistent with an accidental fall. But we weren't allowed to cross-examine Dr. Wong about his report. The District Judge said, well, the report speaks for itself. We haven't seen that before, but that's what the District Court ruled. Another thing that we had, we had Mrs. Goodman testify. I'm a state court trial lawyer, and I've tried a number of homicide cases down there. And Mrs. Goodman testified that she didn't kill her husband. And yet, five witnesses testified that they believed that she did kill her husband. And those five witnesses were the investigating officer, Detective Pateek. Said he's 100% certain two years later, after all the evidence comes in, he's 100% certain that she killed her husband. Detective Briscoe. Dr. Wong said he still believes it's a homicide. Two years down the line, he's not willing to say that he made a mistake in his report. Still believes it's a homicide. Dr. Lachmanan and Dr. Fiero, they all said that they continue to believe it's a homicide. So what we have is we have a 70-year-old woman, or she's probably 75 at the time of the trial, and she's left there on her own. We can't bring in anything that exculpates her. We can't bring in the DNA, we can't bring in the blood, we can't bring in the fingernail analysis, we can't bring in any of the documentary evidence that we would ordinarily bring in on a homicide case. And what happened was the district court treated this as a medical malpractice case, when in fact it was a homicide case. The jury was asked to determine, its first question was, is the autopsy report false? That is, when it says it's a homicide, is it false? The jury came back and said, we cannot conclude that that is false. Therefore, despite what my learned colleague says, the jury found that Mrs. Goodman, the jury was unable to find that Mrs. Goodman did not kill her husband. My colleague, representing Dr. Lachmanan... I'm sorry? I will gladly wrap up. It is an honor to be here. I hope we follow the prior opinion from this court. I hope we find that the district court failed to, and I hope we remand for a new trial, and the district court does what this court said it should have done last time.
judges: Nguyen, Owens, Vitaliano